## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHINYERE UZOUKWU,** | |
| Plaintiff, | |
| v. | Case No. 11-cv-00391 (CRC) |
| **METROPOLITAN WASHINGTON COG,** <u>**et al.,**</u> | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Chinyere Uzoukwu's two-year tenure of employment with the Metropolitan Washington Council of Governments ("COG") was marked by a series of conflicts and bizarre interactions with her supervisors and coworkers.  After she was terminated—purportedly due to an overall reduction in force—Uzoukwu sued, alleging that she had been discriminated against because of her Nigerian ethnicity.  After rulings on multiple motions to dismiss and motions for reconsideration, the parties proceeded to discovery on Uzoukwu's remaining claims of discrimination, hostile work environment, and retaliation under 42 U.S.C. § 1981.  Discovery having concluded, the Defendants—COG, its head of human resources, and Uzoukwu's supervisors—now move for summary judgment, contending that Uzoukwu's claims are barred by the applicable statute of limitations and that she has failed to make out claims under Section 1981.  As explained more fully below, the Court finds that Uzoukwu's claims are timely and that she has put forth sufficient evidence to entitle her to present her claims of discrimination and retaliation to a jury.  The Court will therefore deny the Defendants' motion for summary judgment as to those claims.  The Court will grant the Defendants' motion as to Uzoukwu's hostile work environment claim, however, because most of her complaints stem from incidents that cannot form the basis of that claim.

I.     **Background**

A.     <u>Factual Background</u>

COG is a nonprofit regional association of government officials from Washington, D.C. and its surrounding Maryland and Northern Virginia suburbs.  COG hired Chinyere Uzoukwu, who is an American citizen of Nigerian descent, to fill the newly created position of Policy Analyst within its Department of Human Services Planning and Public Safety ("HSPPS").  Def. Statement of Material Facts ("DSOF") ¶ 3.  Calvin Smith, who was HSPPS's Director and is himself African-American, recommended creating the position and approached Uzoukwu after having interviewed her for a different role.  <u>Id.</u> ¶¶ 2–4.  Smith and Paul DesJardin, who was chief of housing and planning at HSPPS and is white, interviewed Uzoukwu and offered her the position at slightly above the advertised salary.  <u>Id.</u> ¶ 7.  Uzoukwu began work in March 2006, reporting directly to DesJardin.  <u>Id.</u> ¶¶ 8–9.  Unfortunately, Uzoukwu's experience working in HSPPS proceeded much less smoothly than her hiring.  The following incidents illustrate the difficulties that both she and COG experienced during her tenure.

1.     <u>Gary Givens Argument</u>

According to Uzoukwu, in May 2006 she overheard loud voices coming from the office of Greg Goodwin, who was HSPPS's Equal Employment Opportunity Commission ("EEOC") representative and is white.  Pl.'s Ex. 4, Dep. of Chinyere Uzoukwu ("Uzoukwu Dep.") 58–60. She claims that she found DesJardin and Goodwin "red-faced" and standing over Gary Givens, an African-American coworker.  <u>Id.</u>  Uzoukwu testified in her deposition that she believed the managers were "abusing and treating Gary Givens in a very hostile[,] degrading, demeaning manner," and she asked Givens if he would like to come to her office.  <u>Id.</u>  Uzoukwu later raised the incident with Smith, who said he would look into the matter.  <u>Id.</u> at 64–65.  Uzoukwu

maintains that after she complained to Smith, she asked to participate in other groups within HSPPS, but was denied the opportunity and worked exclusively under DesJardin in the housing and planning division.  Id. at 68–70.

### 2.    Initial Evaluation

As a new employee, Uzoukwu was subject to a six-month probationary period, and DesJardin evaluated her at the end of that period in August 2006.  DSOF ¶ 10–11.  According to COG, Uzoukwu received a favorable score of 90 out of 100 on the evaluation, which entitled her to a 4.5 percent pay increase.  Id. ¶ 11; Def.'s Ex. F, Deposition of Imelda Roberts, COG's Director of Human Resources ("Roberts Dep.") at 25:10-18.  Uzoukwu disputes that her initial evaluation was positive.  According to her, DesJardin first gave her a negative review with a score of 83.  That review explained that

> [a]s the position of Policy Analyst is to be proactive and forward thinking, during this introductory period, I have found Chinyere to be reactive and passive . . . . During the review period, Chinyere has not adequately engaged the Managers or the Director with thoughts, ideas or creativity that this position demands.  Instead she has created an email relationship and avoids contact with her colleagues in the department.  This is not acceptable. . . . Because the "Policy Analyst" position was a new role at COG and that Chinyere has not stepped up to her abilities for the task that is satisfactory to overall development of policy decisions, I recommend that Chinyere's probationary status be extended an additional 3 months[.]

Pl.'s Ex. 5.  Uzoukwu contends that DesJardin told her she would likely be terminated as a result of the poor review, which prompted her to complain in an email to COG's Director of Human Resources, Imelda Roberts, that her supervisors had "manufactured reasons to not only give me a negative appraisal but _seriously_ attempt to extend my probation."  Def.'s Ex. B, Uzoukwu Dep. Ex. 3 (emphasis in original).  She added that because "this experience/process has been so horrendously prejudiced . . . [she was] contemplating a formal complaint" but was having difficulty reaching her EEOC representative.  Id.  Only then, Uzoukwu alleges, did she receive the final, positive evaluation noted by COG.  Uzoukwu Dep. 81–82, 85–87.  COG disputes that

her evaluation was changed after she emailed Roberts, and it appears that at least one of her emails complaining about her evaluation discusses the later, higher rating she received.  See Pl.'s Ex. 6.

DesJardin testified in his deposition that he was surprised by Uzoukwu's email given the positive review.  Def.'s Ex. E, Deposition of Paul DesJardin ("DesJardin Dep.") at 42:11–12, 48:18–21.  In an email, DesJardin and Smith told Uzoukwu that they were confused and disturbed by her allegations of racism and prejudice.  Pl.'s Exs. 11–13.  They advised her that she could file a complaint with COG's EEO Committee and recommended that she seek counseling through its Employee Assistance Program ("EAP").  Id.  Uzoukwu did not file a formal complaint with the internal EEO Committee.  DSOF ¶¶ 14–15.

### 3.    Conversation with Smith

In late 2006 or early 2007, internal COG documents were inadvertently placed in a media packet that was distributed at a conference.  David Robertson, COG's Executive Director, later interviewed Uzoukwu and two other individuals working on the event about what had happened. Uzoukwu Dep. 95–97.  Uzoukwu testified she was concerned that she might be fired and spoke with DesJardin about the incident.  Id. at 97–98.  Several weeks later, Uzoukwu raised the matter with Smith over lunch, complaining that she had been treated worse than her two coworkers, who were white.  Id. at 98–99.  According to Uzoukwu, Smith responded that she should understand that she does not "have white privilege."  Id.

### 4.    Coworker Disputes

Uzoukwu complains about two other incidents involving coworkers.  In August 2007, she emailed a COG human resources representative, claiming that a coworker, Abdul Mohammed, had "intimidat[ed]" her by "act[ing] like he[ was] going to literally run [her] over" when they

would pass each other in the office hallway by asking her "where [she] was from[.]"  Pl.'s Ex.
24.  Uzoukwu testified that Roberts scheduled a meeting with the two, during which Roberts
stood by while Mohammed yelled at her.  Uzoukwu Dep. 182–83.  The next month, according to
Uzoukwu, she overheard a joke between her coworkers that she "ha[d] the right name but the
wrong color."  Id. at 136–38.  She says she alerted DesJardin and Smith about the joke but
received no response.  Id. at 138–40.

### 5.   Department-Wide Emails

In October and November 2007, two company-wide emails were sent from Uzoukwu's
email account.  The first was sent in response to an internal meeting announcement:

> Just an FYI and update—Being that I am a homeless and undocumented immigrant
> . . . it may be difficult for me to be here by 9:30 am, as I have to leave from one
> shelter (where I sleep) to go to another (to eat—my oatmeal nonetheless) so to
> prepare to get to my third shelter COG (where I get to spend the day). You know
> how monitoring and surveillance goes.

Uzoukwu Dep. Ex. 7.  Uzoukwu disputes that she sent the email.  Uzoukwu Dep. 151.  She
acknowledges, however, that she sent the following email two weeks later:

> Over the past several months, someone has intentionally and maliciously attempted
> to turn my rather quiet, reserved life into hell. As you can guess, this is rather
> upsetting, as perhaps it would be to you. In as much as the events could be
> regressed, all indications point to someone here at COG—*an extremely "fearless"
> but cowardly individual no less*—which is why I'm sending this e-mail.
>
> In one instance my home was entered through my dining room window. In another
> instance my house keys were compromised from my office here at COG (*breaching
> both the privacy of my office and the security of my locked desk drawers*) and my
> home entered on several occasions. One morning, I woke up at 6:00 am to find both
> my newly installed security door and front entry door open. My keys absolutely
> could not have been compromised anywhere else, short of the companies that
> provided them.
>
> In addition to the issue of my home being burglarized, my car has been vandalized.
> Despite these many happenings, in each instance, they don't measure up to direct
> involvement by law enforcement (*local police action—who explain it as "an act
> of intention by some disturbed individual whom I may have upset somehow"*).
> While it's unimaginable (*at least to me, until now*) to think someone at your place

5

of employment can totally violate your personal privacy beyond your work environment—following you home and everywhere else you may go, essentially stalking you. That is/was what I am dealing with. Individuals who behave in such cowardly ways usually have a problem and need help! They are sick! They may even talk about it in jest or bravado to display control/power. But they are sick.

If these acts weren't so violating, I'd shrug it off and keep going. But, it's beyond the pale. Everything we have regressed, unfortunately points to COG. I am asking for your assistance. If, perhaps, you have any sliver of hearsay. In the event that you come across someone displaying such "fearless" and in my estimation shameful bravado, please let me know in whatever manner you feel most comfortable. I **REALLY, REALLY, REALLY**, want to know. It would be great if that person could talk directly to me—***I'm sure I'd FIND a way to laugh along with them***!

We have a long holiday weekend ahead. If any thoughts should cross your mind on this, please let me know. As the story goes, I may be homeless—☺☺☺, but even the homeless have a right to not be violated! Anything you can share is appreciated!

Id. Ex. 9.  Unsurprisingly, Roberts testified that a number of employees came to her with

concerns about the tenor of these emails.  Roberts Dep. 41.

### 6.      Mandatory EAP Referral

Shortly after Uzoukwu distributed the second email, Roberts recommended to DesJardin

and Smith that Uzoukwu be referred for mandatory EAP counseling.  DSOF ¶ 18.  A COG

memorandum explained that the organization was mandating counseling because of the two

emails Uzoukwu had recently sent; her failure, without reason, to attend a departmental meeting;

and prior inappropriate emails.  Pl.'s Ex. 17.  Uzoukwu resisted the counseling referral and

maintained that she had been given leave the day of the meeting in question.  Pl.'s Ex. 18.

A memorandum from COG's EAP provider describes Uzoukwu's resistance to releasing

detailed information about her counseling sessions to her employer.  Pl.'s Ex. 19.  Initially, the

EAP provider explained to Uzoukwu that the release she was expected to sign would allow

disclosure to COG of "attendance and compliance, but no clinical or private info."  Id. at 11.

After Uzoukwu's first session, the provider sent Roberts a letter stating:

The Consent for Release that is typically used for a Mandatory Referral, when signed, allows the EAP to verify the following information:

- Compliance with requirement to schedule and keep appointments
- Provider treatment recommendations for [employee's] care
- Information regarding compliance with recommended treatment.

The Consent for Release signed by Ms. Uzoukwu allows verification for the following information only

- Compliance with requirement to schedule and keep appointments.

I cannot disclose any further information, based on the Consent for Release that is currently signed.

Id. at 7.  The provider's notes also detail that he

won't agree to see [Uzoukwu] again [because] she will only sign off on attendance, and he isn't going to waste his time or hers when she isn't willing to work in the sessions, just so he can confirm that she was there for 4 sessions.  In particular when [the consultant] thinks [Uzoukwu] needs something beyond EAP, confirming attendance at EAP sessions would not serve a purpose.

Id.  After the provider explained to Roberts and Smith that he would not schedule another session with Uzoukwu unless she signed a full release, id. at 6, Roberts and Smith sent Uzoukwu a memorandum explaining that she would be terminated if she did not comply fully with EAP counseling, Pl.'s Ex. 20.  Uzoukwu then signed the full release and attended three additional sessions.  Pl.'s Ex. 19.  After these sessions, the EAP provider informed Roberts that he "did not set forth recommendations for any further counseling or treatment at this time."  Pl.'s Ex 21.  COG then cleared Uzoukwu to return to work.  Pl.'s Ex. 22.

7.    Termination

Smith voluntarily left COG in January 2008.  Def.'s Ex. C, Deposition of Calvin Smith ("Smith Dep.") at 19:9–10; 41:12–42:1.  According to COG, he was not involved in any discussions regarding Uzoukwu's termination.  DSOF ¶ 24.  After Smith left, Robertson determined that two existing employees would be promoted to assume Smith's responsibilities.

Def.'s Ex. D, Deposition of David Robertson ("Robertson Dep.") at 59:4–16.  Robertson further

testified that he was concerned about HSPPS's finances because of a freeze in the amounts of

dues COG was receiving from members.  Id. at 11:14–12:17.  According to COG, HSPPS was

the only department with a dedicated policy analyst; the other departments collectively relied on

a policy analyst in the organization's legal department.  DSOF ¶ 5.  Robertson thus testified that

he terminated Uzoukwu's position as duplicative, Robertson Dep. 26:5–13, and she received

notice in March 2008.  DSOF ¶ 23.  Roberts testified that five positions in total were terminated

from September 2007 to September 2008.  Roberts Dep. 12–16.

> B.     Procedural Background

Uzoukwu brought her initial complaint in February 2011 against COG, Smith, DesJardin,

Roberts, and numerous other Defendants.  In that complaint, she claimed violations of Title VII,

the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Equal Pay

Act, and various state laws.  Judge Wilkins, who previously presided over this case, dismissed

the suit in February 2012 because Uzoukwu had failed to file her complaint within 90 days of

receiving her right to sue letter from the EEOC.  Op. (Feb. 28, 2012).  He reconsidered his ruling

in September 2013, however, after Uzoukwu requested leave to file a second amended complaint

adding claims under 42 U.S.C. § 1981.  Op. (Sep. 30, 2013).  She filed the request for leave to

file the second amended complaint first as an exhibit to a surreply to the Defendants' motion to

dismiss in June 2011 and again as a separate motion in July 2011.  The Defendants thereafter

filed a new motion to dismiss the remaining claims, which Judge Wilkins granted as to the

outstanding state law claims but denied as to the Section 1981 claims.  Op. (Jan. 21, 2014).  The

Court specifically found that Uzoukwu's Section 1981 claims were not barred by the applicable

statute of limitations because even the latest possible date from which to begin counting the

limitations period would cover the date of Uzoukwu's termination.  Id. at 3–6.  The Court also rejected the Defendants' contentions that Uzoukwu had failed to plead intentional discrimination as required under Section 1981, that Uzoukwu's allegations did not amount to a hostile work environment, and that her complaints constituted protected activity sufficient to make out a claim of retaliation.  Id. at 6–14.

Uzoukwu's remaining claims are for hostile work environment against Smith and COG; retaliation against Smith, DesJardin, Roberts, and COG; and disparate treatment against COG under Section 1981.  The parties have completed discovery and the Defendants now move for summary judgment, asserting that Uzoukwu's remaining claims are barred by the statute of limitations, that she has failed to offer sufficient facts to demonstrate disparate treatment or a hostile work environment, and that she cannot rebut the Defendants' race-neutral justification for the alleged adverse employment actions.  The Court heard argument on the Defendants' motion on May 7, 2015.

## II.     Legal Standards

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In ruling on a motion for summary judgment, the court accepts as true the nonmovant's evidence and draws all reasonable inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The nonmovant may not, however, rely on mere allegations or conclusory statements.  Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

Section 1981 protects the right of "[a]ll persons" to "make and enforce contracts," including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" without respect to race.  "To evaluate a section 1981 claim, 'courts use the three-step McDonnell Douglas framework for establishing racial discrimination under Title VII.'" Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting Carney v. Am. Univ., 151 F.3d 1090, 1092–93 (D.C. Cir. 1998)).  A plaintiff must make out a *prima facie* case by establishing "that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002).  Likewise, a *prima facie* case of retaliation requires the plaintiff to demonstrate that (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) the employer took the adverse action because of the employee's protected activity.  Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013); Jones v. Wash. Times, 668 F. Supp. 2d 53, 59 (D.D.C. 2009).  The burden then shifts to the employer "to articulate 'some legitimate, nondiscriminatory reason' for the employment action, which the plaintiff can rebut by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination." Brown, 774 F.3d at 1023 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973)).

## III.    Analysis

The Defendants seek summary judgment as to all of Uzoukwu's remaining claims.  They maintain that (1) her claims are barred by the applicable four-year statute of limitations; (2) she has failed to present facts demonstrating intentional discrimination; (3) her allegations do not

amount to a hostile work environment; and (4) she cannot rebut COG's facially legitimate justification for her termination.  The Court will address each of the Defendant's contentions in turn.

    A.    Statute of Limitations

    The Defendants assert that Uzouwku's claims are barred by the four-year statute of limitations that applies to post–contract formation Section 1981 claims.  For the sake of clarity, the Court will outline the dates that are relevant to this issue.  Uzoukwu was terminated in March 2008.  She filed her initial complaint in February 2011.  She then attached a proposed amended complaint to a surreply to the Defendants' motion to dismiss the initial complaint in June 2011, raising her Section 1981 claims for the first time.  Judge Wilkins dismissed the case in February 2012, but Uzoukwu filed a motion for reconsideration, again attaching her proposed amended complaint, in March 2012.  The case was reinstated in September 2012, and Uzoukwu filed a final amended complaint that same month.  According to the Defendants, the limitations period should be calculated back from the first time Uzoukwu filed an amended complaint after her case had been dismissed, meaning March 2012.  Because this limitations period would begin just days before Uzoukwu's termination, several of her allegations arguably would be time-barred.[1] Alternatively, the Defendants contend that Uzoukwu's most-recent amended complaint controls, which would bar the entire case.  Uzoukwu rejoins that the complaint she filed before the case

_____

[1]  This contention is arguably foreclosed by the law of the case, as defendants raised an identical argument in their second motion to dismiss, which was denied.  See Mem. Op. (Jan. 22, 2014). The Court will address the merits of the issue, however, because the Opinion denying the defendants' motion to dismiss did not establish the precise date that triggered the statute of limitations.

was initially dismissed controls, and therefore most of her employment at COG would fall within the limitations period.

Ordinarily, claims asserted in an amended complaint relate back to the date of the original pleading if they arose out of the conduct described in the original complaint. Fed. R. Civ. P. 15(c)(1)(B).  But "once a suit is dismissed, even if without prejudice, 'the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing.'" Ciralsky v. CIA, 355 F.3d 661, 672 (D.C. Cir. 2004) (quoting Elmore v. Henderson, 227 F.3d 1009, 1011 (7th Cir. 2000)).  Under this rule, if the order dismissing Uzoukwu's original complaint had remained in force and she had filed a new suit raising her Section 1981 claims, then she could not have benefited from the earlier tolling of the statute of limitations.  But that is not what happened.  Instead, Judge Wilkins granted Uzoukwu's motion for reconsideration and reopened the case.  By granting the motion for reconsideration, Uzoukwu's original complaint was reinstated along with its tolling effect.  See id. at 674 (remanding order of dismissal to district court for reconsideration, which would have the effect of tolling the statute of limitations) (citing Estate of Solis-Rivera v. United States, 993 F.2d 1, 3 (1st Cir. 1993)).

While Uzoukwu's original complaint does not include claims under Section 1981, it raises claims based on the conduct at issue in this lawsuit, including her hiring and termination, her performance appraisal, her alleged hostile and prejudicial treatment by her supervisors, and her disputes with her coworkers.  Compl., Feb. 16, 2011 ¶¶ 14–15, 23, 33.  As a result, Uzoukwu's Section 1981 claims relate back to the filing of her original complaint in February 2011.  The four-year limitations period therefore encompasses most of the allegations underlying her claims.  Some of the occurrences giving rise to her claim for hostile work environment

occurred before the limitations period, but the Defendants can be held liable for these events under a continuing-violation theory.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002) ("Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.").  Accordingly, all of Uzoukwu's claims under Section 1981 fall within the applicable statute of limitations.

B.     Intentional Discrimination

The Defendants next contend that Uzoukwu has failed to present evidence demonstrating intentional discrimination by her supervisors.  To prevail on a claim of disparate treatment or retaliation under Section 1981, a plaintiff must establish that the defendants acted with a discriminatory purpose, meaning that they acted "because of" the plaintiff's race or protected activity.  See, e.g., Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979).  Here, the Defendants assert that Uzoukwu "alleges simply that she is from Nigeria and leaves for the Court to conclude how any disfavored treatment she received can be linked to her ethnicity."  Mot. Summ. J. 6–7.

Uzoukwu has offered evidence of more than the mere fact of her ethnicity.  She testified in her deposition that Smith, her supervisor, responded to her concerns that she was being treated worse than her white colleagues by explaining that she did not have "white privilege."  The import of Smith's purported comment is far from obvious.  Smith, as an African-American, might well have intended simply to begin a frank conversation about the challenges that non-white employees face in the workplace.  But a jury might also infer, as Uzoukwu suggests, that the comment was instead meant to discourage her from complaining about instances of

discrimination due to COG's negative views of non-white employees. Similarly, Uzoukwu alleges that her supervisors failed to act on her complaints about conduct she considered racially insensitive or derogatory—such as the joke by her coworkers that she had the "right name but the wrong color." While the Court struggles, frankly, to see how Smith's comments and the coworkers' joke could support an inference of discriminatory intent, it cannot conclude with confidence at this stage that *no* reasonable juror could accept Uzouwku's interpretation of them.

Moreover, although DesJardin and Roberts testified that they did not know Uzoukwu's ethnicity before she was terminated, a jury might choose not to credit this testimony at trial. As Uzoukwu points out, her name, appearance, and accent all indicate her West-African descent, and defendants may not escape liability for ethnicity discrimination merely because they are unaware of the precise nation from which a plaintiff originates. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981."). The Court therefore finds that Uzoukwu has put forth (barely) sufficient evidence from which a jury could infer that the Defendants acted with discriminatory intent.

### C.    Hostile Work Environment

The Defendants next maintain that Uzoukwu has not made out a *prima facie* case of hostile work environment. "To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The court "looks to the totality of

the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)). A hostile work environment claim has both a subjective and an objective component, Harris, 510 U.S. at 21, and the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

Uzoukwu asserts that evidence of the following alleged incidents is sufficient to make out a claim of hostile work environment: (1) she was denied work opportunities after she complained about the treatment of Gary Givens; (2) DesJardin presented her with a very negative initial performance review, causing her significant distress; (3) Smith told Uzoukwu that she lacked "white privilege"; (4) COG responded inadequately to her dispute with the coworker who was intimidating her and failed to respond at all to a joke by her coworkers that she had the "wrong color"; (5) the Council required Uzoukwu to attend EAP counseling and to disclose details of her sessions to her employer; and (6) she was terminated. According to Uzoukwu, these incidents were sufficient to constitute "pervasive and constant abuse." Opp'n Mot. Summ. J. 42.

Several of the incidents of which Uzoukwu complains cannot form the basis of a hostile work environment claim. The ordinary work-related activities of a supervisor, such as denying an employee work opportunities or issuing a negative performance evaluation, are not sufficiently severe or abusive to constitute objective harassment. Swann v. Office of Architect of Capitol, No. 12-cv-01320, 2014 WL 5823450, at *7 (D.D.C. Nov. 10, 2014) (citing, e.g., Wade v. District of Columbia, 780 F. Supp. 2d 1, 19 (D.D.C. 2012)). Likewise, the mere fact that Uzoukwu overheard an argument between an African-American coworker and a white

supervisor, without knowing the context of the dispute, is not evidence of intimidation and ridicule directed at Uzoukwu.  And Uzoukwu's dispute with Abdul Mohammed—who allegedly stood too close to her and yelled at her in Roberts's presence—is the kind of "ordinary tribulation[] of the workplace" that does not give rise to a hostile workplace claim.  Franklin v. Potter, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) (citing Faragher, 524 U.S. at 788).

Removing these events from the equation, Uzoukwu is left with the comment by Smith that she lacked "white privilege"; COG's alleged failure to respond to the joke that she had "the right name but the wrong color"; and the mandatory EAP counseling.  These incidents are not sufficiently severe or pervasive to "alter the conditions of the victim's employment and create an abusive working environment."  Ayissi-Etoh, 712 F.3d at 577.  Because three incidents over a two year period of employment is far from frequent, the events in question must be particularly severe to alter the conditions of Uzoukwu's employment.  See Baloch v. Norton, 355 F. Supp. 2d 246, 260 (D.D.C. 2005) ("severity can in essence compensate for a lack of pervasiveness, despite the fact that isolated or occasional episodes rarely merit relief" (citing Harris, 510 U.S. at 23)).  The events at issue here do not meet that standard.  As noted above, Smith's comment and the joke regarding Uzoukwu's name and color remain opaque.  And the mandatory EAP counseling, while no doubt an unpleasant experience for Uzoukwu, was not so severe as to support a hostile work environment claim standing alone.  Nor has Uzoukwu connected the EAP referral to her race or ethnicity.  The only troubling aspect of the EAP referral is the possibility that COG threatened Uzoukwu with termination unless she allowed her counselor to reveal information about what occurred during her sessions or any diagnosis that was made.[2]  But a single incident,

---

[2]  While there is some dispute regarding the extent of the disclosures demanded, Uzoukwu has put forth evidence that she may have been required to disclose sensitive personal information

unless it is extremely egregious, cannot transform an ordinary workplace into an abusive environment.  Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe as to constitute a hostile work environment.").  Accordingly, the Court concludes that Uzoukwu's evidence is insufficient to establish a hostile work environment.

### D.    Retaliation

To establish a retaliation claim under Section 1981, a plaintiff must show that she engaged in protected activity and that her employer took an adverse employment action against her because of that activity.  Ayissi-Etoh, 712 F.3d at 578 (citing Holcomb v. Powell, 433 F.3d 889, 901–02 (D.C. Cir. 2006)).  The Defendants do not dispute that terminating Uzoukwu was a materially adverse action.  But they argue that Uzoukwu's complaints were not protected activity and that she lacks evidence of a causal link between the complaints and her termination.  They also contend that Uzoukwu has failed to put forth evidence to dispute Robertson's justification for eliminating her position.

### 1.    Protected Activity

"Statutorily protected activities include 'opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'"  Harris v. D.C. Water & Sewer Auth., 922 F. Supp. 2d 30, 34 (D.D.C. 2013) (quoting Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209, 212 (D.D.C. 2006)), rev'd on other grounds 791 F.3d 65 (D.C. Cir. 2015).  To constitute protected activity in the context of a Section 1981 claim, Uzoukwu must

---

regarding the content of the sessions.  See Pl.'s Ex. 19 at 7 (disclosures to employer included "treatment recommendations for [employee's] care" and "[i]nformation regarding compliance with recommended treatment").

have raised concerns related to discrimination based on her race or ethnicity.  See Harris, 922 F.

Supp. 2d at 34 ("[T]he plaintiff must be opposing an employment practice made unlawful by the

statute under which [he] has filed [his] claim of retaliation." (alterations in original) (quoting

Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 92 (D.D.C. 2006))).  Complaints of

mistreatment, "without mentioning discrimination . . . [do] not constitute protected activity, even

if the employee honestly believes she is the subject of . . . discrimination."  Broderick v.

Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (citing Sitar v. Ind. Dep't of Transp., 344 F.3d

720, 727–28 (7th Cir. 2003)).

Uzoukwu's complaints were not limited to workplace issues; she specifically complained

of perceived racism and prejudice.  In response to receiving her initial appraisal, Uzoukwu sent

DesJardin an email stating:  "While I feel I've done a tremendous job here, despite, all the

hostilities, and, now, what I've come to see as your biases and prejudice in enabling these actions

by co-workers, I won't make much issue of this."  She added:  "There are various reasons for

termination . . . and even various methods, but when supervisors have to go to such great lengths

to create an atmosphere, such as the two of you have with me . . . then it becomes racist and

prejudicial and needs to be addressed within legal protections."  Pl.'s Ex. 6 (ellipses in original).

She testified in her deposition that she complained about the argument among Goodwin, Givens,

and DesJardin, Uzoukwu Dep. 64–66; that she told Smith she had been treated worse than her

white co-workers by Robertson, id. at 98–99; and that she had asked management to address the

alleged office joke that she had the "wrong color," id. at 136–40.  The Defendants, moreover,

clearly considered these complaints to raise issues relating to Uzoukwu's race or ethnicity

because they recommended that she contact COG's EEO office.  Pl.'s Ex. 13.  They also

discussed among themselves how to respond to her complaints in a manner that could not be

construed as retaliatory.  Pl.'s Ex. 14.  In short, by complaining of prejudice and racism by her supervisors, Uzoukwu engaged in protected activity.

2.    Causation

Uzoukwu must also produce evidence to establish a causal link between her protected activity and the employer's later adverse actions.  Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).  "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  Id. (quoting Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985)) (internal quotation marks omitted).  Such a temporal connection, however, must be "very close."  Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012).  Generally, courts require the two events to have occurred, at most, within three or four months of one another.  Id. (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)).  Alternatively, a plaintiff may establish causation through direct or circumstantial evidence of her supervisors' intent.  E.g., Kilby-Robb v. Duncan, No. 1:12-cv-01718, 2015 WL 106956, at *9 (D.D.C. Jan. 8, 2015).

Uzoukwu does not provide evidence of protected activity taking place within a few months of her termination.  Her complaints about her initial performance appraisal occurred in late 2006; her conversation with Smith took place in early 2007; and the coworker joke occurred in September or October 2007.  These events are too temporally distant from her termination in March 2008 to establish causation on that basis alone.  But Uzoukwu provides additional evidence to support an inference that she was fired because of her complaints.  As Uzoukwu points out, the memorandum mandating EAP referral refers to the two department-wide emails Uzoukwu sent out, as well as other unspecified, "inappropriate emails."  Pl.'s Ex. 17.  Given that

Uzoukwu complained numerous times of discrimination, a jury could infer that these other emails referred to her complaints alleging racism and prejudice.  Moreover, as noted above, although the Court is skeptical of the relevance of Smith's comments about "white privilege," a reasonable juror might credit Uzoukwu's contention that Smith was responding negatively to Uzoukwu's allegations of discrimination.

Robertson's testimony that he alone decided to terminate Uzoukwu's position and was unaware of her complaints does not necessarily defeat Uzoukwu's evidence of causation.  A jury may choose not to credit Robertson's account and may instead credit the theory Uzoukwu advances.  Uzoukwu presents a "cat's paw" theory of liability, in which one supervisor or set of supervisors—here, Smith and DesJardin—is held liable for an adverse employment action by a different individual within the organization—here, Robertson—when that employment action is proximately caused by those supervisors' discriminatory conduct.  See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1192 (2011).  Specifically, in Staub, the Supreme Court endorsed the theory that

> [a]nimus and responsibility for the adverse action can both be attributed to the [plaintiff's supervisor] if the adverse action is the intended consequence of that agent's discriminatory conduct. . . . And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm.

Id.  Here, Uzoukwu has put forth evidence from which a reasonable jury could conclude that her supervisors and the head of human resources at COG sought to retaliate against her because of her complaints relating to ethnicity.  Her claim may proceed, even though a neutral decisionmaker terminated her, to the extent that a reasoanble jury could conclude that the decision resulted from influence exerted by her supervisors.  Indeed, although Robertson testifies that he alone made the decision to eliminate Uzoukwu's position, he acknowledges that he "sought input" from Roberts and DesJardin about whether to do so.  Robertson Dep. 31–33.

Accordingly, Uzoukwu has made out a *prima facie* case of retaliation.

3.     Pretext

"If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a 'legitimate, nondiscriminatory reason' for its actions." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (quoting Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007)).  If the employer does so, then the court "looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [the plaintiff's] evidence of retaliation." Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Jones, 557 F.3d at 677).  According to the Defendants, Uzoukwu's positon was eliminated by Robertson due to budget constraints and redundancies, and Robertson had no knowledge of Uzoukwu's difficulties at COG.  Uzoukwu does not dispute that this justification, if true, would have served as a legitimate, nondiscriminatory reason to terminate her employment.  Instead, she asserts that the Defendants' justification is unworthy of credence.

Uzoukwu puts forward evidence that at least raises a question of fact regarding COG's justification for terminating her.  Robertson testified that eliminating Uzoukwu's position was part of a larger plan to reduce COG's costs in anticipation of lower membership dues.  Robertson Dep. 26–27.  But Uzoukwu's termination was one of only "two or three specific activities" that Robertson attests were made to cut costs, id. at 29:8–12, and besides his post hoc testimony, the Defendants put forth no evidence of any plan to reduce overhead in early 2008.  Moreover, Robertson acknowledged that, in splitting HSPPS into two separate groups in the wake of Smith's departure, COG actually added positons, albeit with a modest cost reduction.  Id. at 47– 48 (noting that the groups replacing HSPPS added an additional full-time employee and that

overall costs for the entire department were reduced by approximately $140,000 as a result of the reorganization).

Besides evidence challenging COG's stated reason for her termination, Uzoukwu also advances independent evidence of retaliatory motives. As discussed above, Uzoukwu has put forth sufficient evidence to advance a "cat's paw" theory of liability, which could justify a jury finding that Uzoukwu's termination was retaliatory. Although Robertson testifies that the ultimate decision to eliminate Uzoukwu's position was made by him alone, he "work[ed] with Mr. DesJardin and Imelda Roberts . . . [and] sought input and discussed" the decision with them. Robertson Dep. 31:4–6. And at several points throughout Uzoukwu's disputes with her supervisors, they suggested that Robertson should be made aware of her complaints. Pl.'s Exs. 14, 24. A jury could reasonably conclude from this evidence, taken together, that the decision to terminate Uzoukwu was in fact made because of her complaints, through the influence of her supervisors on Robertson's decision.

## IV.    Conclusion

For the reasons stated above, the Court will grant the Defendants' motion for summary judgment as to Uzoukwu's claim of hostile work environment but deny the Defendants' motion as to her claims of disparate treatment and retaliation. An Order accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:   September 18, 2015